UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MELISSA LOREN,

                     Plaintiff

                                                         DECISION AND ORDER

-vs-

                                                         07-CV-6166 CJS

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                     Defendant.

_____

APPEARANCES

For the Plaintiff:            William J. McDonald, Jr., Esq.
                                Bond and McDonald, P.C.
                                91 Genesee Street
                                Geneva, New York 14456

For the Defendant:         Terrance P. Flynn, Esq.
                                United States Attorney for the
                                Western District of New York
                                Christopher V. Taffe, Esq.
                                Assistant United States Attorney
                                100 State Street
                                Rochester, New York 14614

INTRODUCTION

     This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner"), which denied plaintiff's application for disability insurance benefits.  Now before the Court is plaintiff's motion for judgment on the pleadings [#4] and defendant's cross-motion [#6] for the same relief.  For the reasons stated below, defendant's application is denied, plaintiff's

1

application is granted, and this matter is remanded for further administrative proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for disability benefits on or about July 22, 2003, claiming to be disabled due to lower-back injury. The date of onset of Plaintiff's alleged disability is August 15, 2000. On August 28, 2003, the Commissioner denied the application. On August 23, 2006, a hearing was held before an Administrative Law Judge ("ALJ"), and on September 27, 2006, the ALJ issued a written decision denying Plaintiff's claim. In that regard, the ALJ determined that Plaintiff was not disabled at any time prior to March 31, 2003, her "date last insured." Plaintiff appealed, however, the Appeals Council declined to review the ALJ's determination. On March 28, 2007, Plaintiff commenced the instant action. Plaintiff filed the subject motion for judgment on the pleadings on October 3, 2007, and Defendant filed the subject cross-motion on November 28, 2007. On April 10, 2008, counsel for the parties appeared before the undersigned for oral argument of the motions.

## VOCATIONAL HISTORY

Plaintiff is 45 years of age and has a ninth-grade education. Her employment history includes work as a laborer, janitor, dishwasher and kitchen helper. It is undisputed that the exertional requirements of Plaintiff's past work exceed that required for sedentary work.

## MEDICAL EVIDENCE

On August 3, 1993, Plaintiff injured her lower back while working, and since that time she has experienced lower-back pain, radiating into her right leg. In December

2

1993, an MRI showed a bulging disc at L4-5 with displacement of the thecal sac, as well as degenerative changes of the L-5 and L-S1 discs.  A subsequent MRI in August 2000 also showed degenerative changes at the L4-5 and L5-S1 discs, with disc dessication, and a  small annular tear at L4-5 with disc bulges and bilateral facet joint hypertrophy.[1]  In January 2004, another MRI confirmed the earlier findings, and also showed a small disc protrusion at L5-S1 abutting the left S1 nerve root within the spinal canal.  Finally, an MRI in October 2005 showed a disc bulge at L4-5 with severe left foraminal inferior recess encroachment at L5-S1.

Between 1994 and August 2000, Plaintiff received treatment from Dr. Reuben Washington, M.D. ("Washington"), an orthopedic specialist.  Washington treated Plaintiff with muscle relaxants, ibuprofen, and physical therapy, however, Plaintiff's pain persisted.  Subsequently, Washington performed lumbar epidural blocks in September 2000 and February 2001, without success.

In April 2001, Plaintiff began treating with Dr. Donovan Holder, M.D. ("Holder"), a pain management specialist.  On April 25, 2001, Holder reported that Plaintiff was complaining of lower back pain, described as "a pinching and burning sensation in the lower back with radiation down the right leg and ankle." (264).[2]  Holder recorded that, "There is nothing that makes her pain better.  Any prolonged standing or sitting increases its intensity." (*Id.*).  Holder examined Plaintiff and found "marked increased

---

[1]According to Cedars-Sinai Hospital's website, " [t]he facet joints are the connections between the bones of the spine. The nerve roots pass through these joints to go from the spinal cord to the arms, legs and other parts of the body. . . .  If the facet joint becomes too swollen and enlarged, it may block the openings through which the nerve roots pass, causing a pinched nerve. This condition is called facet hypertrophy." *See*, http://www.csmc.edu/5758.html.

[2]Unless otherwise noted, citations are to the administrative record.

3

tenderness to bilateral lower lumbar facet area palpation, right greater than left." (*Id.*). Holder's impression was "lumbar facet arthropathy" and "radicular low back pain with degenerative joint disease," which he proposed to treat with "diagnostic lumbar facet blocks, bilateral, and also radiofrequency neurolysis." (*Id.*). In June 2001, Holder performed bilateral lumbar facet blocks, but afterward he noted that Plaintiff was still in pain. (274). On August 14, 2001, Holder noted that Plaintiff was complaining of increased lower back pain and difficulty walking, and that although she was taking Flexeril and ibuprofen, "nothing helps." (259) On July 9, 2002, Holder reported that Plaintiff was still complaining of "sharp radicular pain" in her lower back and tingling in her legs. (259). Subsequently, in August 2002, Holder performed lumbar epidural injections which apparently provided some relief. Thereafter, Plaintiff did not return to Holder until June 24, 2003, when she complained of increased lower back pain, and of being unable to sit or walk for long periods. (251). In August and September 2003, Holder administered three additional epidural injections, without success. Consequently, Holder recommended that Plaintiff consider obtaining a surgical evaluation.

Plaintiff subsequently obtained treatment through the Rochester General Hospital Pain Management Center. However, epidural injections in August 2005 and January 2006 did not provide significant relief. In June 2005, Plaintiff began treating with Dr. William W. Cotanch, M.D. ("Cotanch"), a neurosurgeon, who recommended surgery.

Various doctors have provided opinions regarding Plaintiff's residual functional capacity. On December 14, 2000, Dr. Harry Cole, M.D. ("Cole"), an examining state

agency physician, indicated that Plaintiff should not lift over 20 pounds, and should restrict repetitive lifting, bending, pushing, and climbing.  On July 23, 2001, Washington indicated that Plaintiff could not lift in excess of 15-20 pounds, and should avoid prolonged standing, walking, pushing, and pulling.  Washington stated, though, that Plaintiff's ability to sit was not affected.  On December 26, 2001, Dr. George Sirotenko, M.D. ("Sirotenko"), a consultative examiner for Defendant, indicated that Plaintiff should avoid being in one position for more than 30 minutes, and should be given frequent opportunities to alternate between sitting, standing, and walking throughout the workday.  Sirotenko further stated that Plaintiff should be able to lift, push, and pull objects weighing up to 15 pounds intermittently, but should not lift over her head. On November 15, 2005, Dr. David Hannan, M.D. ("Hannan"), Plaintiff's primary treating physician, indicated that Plaintiff could not lift 10 pounds, and also could not climb, balance, stoop, crouch, kneel, crawl, or climb stairs, though she could occasionally reach, push, and pull.  Furthermore, Hannan indicated that Plaintiff would need to alternate between sitting, standing, and walking, although, he did not indicate a specific amount of time that Plaintiff could sit or stand. (313).  On July 18, 2006, Hannan indicated that Plaintiff was still unable to lift 10 pounds, and that she was able to sit for less than 6 hours during a workday, stand for less than two hours, and had to alternate between sitting and standing to relieve her pain. (338).  Hannan stated that Plaintiff had limited ability to push and pull, and that she was unable to climb, balance, kneel, crouch, crawl or stoop.  Hannan further indicated that Plaintiff's medication made her unable to work with machinery, and also seemed to impair her judgment and ability to make simple work-related decisions. (341-42).

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted). At step five of the five-step analysis above, the Commissioner may carry her burden by resorting to the Medical Vocational

Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Noting that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.")  However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then the Commissioner cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain or perform."[3] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d).[4]

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2).  However, "[w]hen other substantial evidence in the record conflicts with the treating physician's opinion . . . that

---

[3] "Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[4] 20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)).

Administrative Law Judges are required to evaluate a claimant's credibility concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states in relevant part:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2) through (6) and 404.1513(b) (1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.
> 
> ***
> 
> In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a). The regulation further states, in relevant part:

> Factors relevant to your symptoms, such as pain, which we will consider include:
> (i) Your daily activities;
> (ii) The location, duration, frequency, and intensity of your pain or other

> symptoms;
> (iii) Precipitating and aggravating factors;
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

## THE ALJ'S DECISION

At the first step of the five-step sequential analysis described above, the ALJ found that plaintiff was not engaged in substantial gainful employment. At the second step of the analysis, the ALJ found that plaintiff had the following severe impairments: degenerative disc disease with chronic low back pain. At the third step of the sequential analysis, the ALJ found that plaintiff's "severe impairments" did not meet or equal the criteria of any impairment(s) listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P ("the Listings")(20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (13-14).

At the fourth step of the analysis, the ALJ made the following RFC determination:

> [F]or the period from the alleged onset date through March 31, 2003, the claimant retained the following residual functional capacity: sit for two hours at one time and with normal breaks and meal periods eight hours in an eight-hour workday; stand and/or walk two hours at one time and with normal breaks and meal periods six hours in an eight-hour workday; and, lift and carry 10-15 pounds. The claimant is limited to occasional stooping, crouching, kneeling and stair climbing.

(18). The ALJ noted, however, that Plaintiff's symptoms appeared to worsen after her last-insured date:

9

> An increase in her symptoms, functional limitations and medical treatment pertaining to the period after March 31, 2003, may well show that her condition deteriorated; however, the undersigned concludes that the claimant's signs, symptoms and functional limitations do not support a finding of disability for the relevant period of adjudication, i.e., from the alleged onset date through March 31, 2003.

(16). Further, in making his RFC determination, the ALJ found that Plaintiff's allegations regarding her functional limitations were "not totally credible." In that regard, the ALJ found that Plaintiff's daily activities, as described in a questionnaire completed in July 2001, Exhibit 4E, were consistent with sedentary work, and that Plaintiff's description of her daily activities at the hearing was inconsistent with Exhibit 4E, and did not accurately reflect her condition during the period prior to expiration of her insured status. On the other hand, the ALJ found that another questionnaire, Exhibit 11E, which Plaintiff completed in August 2003, five months after the expiration of her insured status, was "more consistent with increased symptoms and need for a sit/stand option." (18). In any event, based upon his RFC determination, the ALJ concluded that plaintiff could not perform her past relevant work.

However, the ALJ concluded, at the fifth step of the sequential analysis, that plaintiff could perform "a full range of sedentary level work." In that regard, the ALJ found that it was appropriate to use the grids, since Plaintiff could perform substantially all the requirements of sedentary work, and because her ability to do sedentary work was not "compromised by any significant non-exertional limitations." Consequently, the ALJ concluded that plaintiff was not disabled.

## ANALYSIS

In this action, Plaintiff contends that the ALJ erred in two respects. First, she

contends that the ALJ failed to make a specific finding as to the onset date of her disability.  And second, she contends that the ALJ failed to properly evaluate her credibility when determining her residual functional capacity.

Plaintiff's first argument relates to the ALJ's observation that her condition worsened after March 31, 2003, her date last insured. (16) ("An increase in her symptoms, functional limitations and medical treatment pertaining to the period after March 31, 2003, may well show that her condition deteriorated[.]"); (17) ("[T]he record shows that the claimant experienced and increase in her back symptoms subsequent to March 31, 2003, when her insured status expired.").  For example, the ALJ acknowledged that Dr. Hannan's opinion dated July 18, 2006, Exhibit 21F, indicated "less-than-sedentary capability." (18).  Similarly, Hannan's report in November 2005 (Exhibit 15F) indicated that Plaintiff needed to alternate between sitting, standing, and walking throughout the day. (313).  In concluding that Plaintiff's condition had not worsened until some time after March 2003, the ALJ noted that Plaintiff had not filed for disability benefits until July 2003, and that she "did not really re-enter treatment again until after her insured status expired." (18).  In that regard, the ALJ was referring to the fact that there is essentially a gap in treatment between August 2002 and June 2003, when Plaintiff returned to Dr. Holder for further treatment.  Based on such observations, the ALJ reasoned that Plaintiff's symptoms must have worsened around the time that she returned to see Dr. Holder in June 2003, which was after her date last insured.  Consequently, the ALJ concluded that Plaintiff could perform a full range of sedentary work through her date last insured, except for being limited to occasional stooping, crouching, kneeling and stair climbing. (18).

11

Plaintiff argues that, since the ALJ appears to concede that Plaintiff became limited to performing less than the full range of sedentary work after her date last insured, that he was required to establish the "onset date" when her condition worsened, in accordance with SSR 83-20, "Titles II and XVI: Onset of Disability ("SSR-83-20"), which the ALJ's decision does not mention.  As already mentioned, the issue arises here because there is a ten-month gap in the record, between August 2002 and June 2003, in which there are no medical records, apparently because Plaintiff did not seek further treatment, and during which time her insured status expired.  The issue is further complicated because there are also no medical records for 2004, and the records from which the ALJ found that Plaintiff's condition worsened date from 2005 and 2006.

At the outset, the Court finds that SSR 83-20 is not applicable in this case, since the ALJ did not find that Plaintiff was disabled at any time. *See, Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997) (Agreeing that SSR 83-20 "applies only when there has been a finding of disability."); *accord, Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004) ("The ALJ did not find that Scheck was disabled, and therefore, there was no need to find an onset date.  In short, SSR 83-20 does not apply."); *Baladi v. Barnhart*, 33 Fed. Appx. 562 (2d Cir. 2002) (unpublished) ("[T]he ALJ's determination that plaintiff was not disabled obviated the duty under SSR 83-20 to determine an onset date.").

However, it is well settled that, "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (Citations and internal quotation marks omitted).  Here, there was a gap in the record,

between August 2002 and June 2003, during which time Plaintiff's insured status expired. In May 2005, the Commissioner attempted to obtain a residual functional capacity assessment from Dr. Holder, but Holder returned the form with the notation, "unable to complete [patient] hasn't been seen since 10/7/03." (291). Apparently because of that, the ALJ chose to rely instead on Dr. Washington's RFC report, which was based on an examination in 2001. However, the Court finds that the ALJ had a duty to develop the record concerning Plaintiff's medical condition during the critical period around March 2003, when her insured status expired. In that regard, the ALJ should, for example, try again[5] to obtain additional information from Dr. Holder, including information concerning Plaintiff's condition after March 2003, from which a retrospective view of her condition might be obtained. *See, Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996) ("A treating physician's retrospective medical assessment of a patient may be probative when based upon clinically acceptable diagnostic techniques."). The ALJ could also seek additional information from Plaintiff and her family members. The Court notes that at the hearing, Plaintiff was not questioned about the apparent worsening of her symptoms, about her condition around the time of March 2003, or about the reason that she returned to see Dr. Holder in June 2003 as opposed to some earlier time prior to her date last insured.

    The Court also believes that the ALJ erred in evaluating the medical evidence, with regard to Plaintiff's ability to sit and stand. As already discussed, the ALJ found that

---

[5] It appears that Dr. Holder may have declined to complete the residual functional capacity assessment because he believed that it was seeking a statement as to her condition in 2005, when it was sent to him, about which he had no knowledge.

Plaintiff could sit for two hours at a time, and with breaks, sit for eight hours in an eight-hour workday, and stand and/or walk for two hours at one time and with normal breaks and meal periods, six hours in an eight-hour workday. (18). On this point, the ALJ gave controlling weight to Dr. Washington's report (283-286), based on an examination performed in February 2001, which indicated that Plaintiff's ability to sit was not impaired by her back pain, and that she was able to stand and/or walk for six hours in an eight-hour workday. (18). Although the ALJ noted that Dr. Sirotenko's December 2001 opinion indicated that Plaintiff needed to alternate between sitting and standing frequently, he essentially dismissed that opinion. (19) ("Dr. Sirotenko's opinion that the claimant was more restricted with need for a sit/stand option is noted but Dr. Washington is given greater and controlling weight."). Unfortunately, the ALJ did not explain why Dr. Washington's opinion, rendered almost a year prior to Dr. Sirotenko's, was entitled to more weight. Nor did the ALJ discuss the fact that Dr. Washington's statement was inconsistent with other evidence in the record. For example, in April 2001, well before the expiration of Plaintiff's insured status, Dr. Holder, a treating physician, noted that Plaintiff's pain increased with prolonged sitting (264). Additionally, on July 24, 2001, in Exhibit 4E, Plaintiff indicated , "[I]t also hurts to sit for long periods of time."[6] (*See also*, 81) (Exhibit 2E, dated July 24, 2001, referring to Plaintiff's limited ability as to "sitting or standing for long periods of time."). In June 2003, Dr. Holder made another file notation regarding Plaintiff's inability to sit for long periods, and Doctors Cotarch and Hannan made similar notations in 2005 and 2006. (See, e.g., 334).

---

[6] The ALJ noted this fact at the top of page 16 of his decision.

Moreover, with regard to Plaintiff's ability to stand and/or walk, Washington's statement that Plaintiff could stand and/or walk for six hours per day appears inconsistent with his own report from July 2001, in which he indicated that he encouraged Plaintiff to seek work "that did not require ... prolonged standing or walking." (229).  Nor did the ALJ apparently consider the possibility that Plaintiff's pain while sitting had increased during the two years between her last appointment with Dr. Washington and the expiration of her insured status.  Consequently, the Court finds that the ALJ failed to properly evaluate the medical evidence.

Regarding the ALJ's evaluation of Plaintiff's credibility, the ALJ made the following observations in his decision:

> In the course of filing her application and appeals, the claimant reported a number of subjective complaints and functional limitations she attributed to her impairments.
>
> In [Exhibit 2E], the claimant alleged to be in constant pain all the time and that she usually had someone drive her to her appointments and help with housework.
>
> ***
>
> In a Daily Activities Questionnaire dated July 2001 the claimant stated that she relied on her husband and daughter to help with heavy housework, and cooking and shopping.  She was able to do light housework such as dusting or other light-type cleaning, once or twice a week.  Because sitting for too long caused pain, the claimant limited her driving and visiting.  She said she watched television, played cards, and sat outside to watch her dog play (noted to be all sedentary activities) (Exhibit 4E).
>
> The claimant completed other paperwork regarding her subjective complaints and functional limitations that were dated subsequent to the date her insured status expired.  In a Daily Activities Questionnaire completed in July 2003, the claimant stated that she was unable to sit or stand for long periods of time, and could not lift, push, pull or twist. (Exhibit 9E).  A Daily Activities Questionnaire completed in August 2003 reflected that claimant continued to rely on family members for help with household chores and that all exertional activities caused pain in her lower back and down her right leg.  She indicated that she spent her time using a computer, watching

television for as long as she was comfortable sitting, sleeping (side effect of medication) and going to Bingo for short periods of time.

\*\*\*

> The claimant's activities of daily living, as stated in Exhibit 4E, are consistent with sedentary exertion. As noted above, the claimant shared cooking and shopping tasks, and could do light housework. She watched television, played cards and would sit outside.
>
> The claimant's questionnaire dated August 10, 2003 (Exhibit 11E, discussed above) is more consistent with increased symptoms and need for a sit/stand option.

\*\*\*

> At the hearing, the claimant testified that her functional limitations since 2000 consisted of: sitting only 15-20 minutes at a time; need to alternate sitting/standing every three to four hours, then needing to recline or lie down for one and one-half to two hours; walk only one block; and lift only 8.6 pounds (gallon of milk). The [ALJ] does not find these limitations to be consistent with her activities of daily living as stated at Exhibit 4E (discussed above). Moreover, if these limitations are accurate, they are more consistent with the claimant's increased symptoms after her [date last insured] . . . .

(18). However, the Court finds that the ALJ's findings, regarding the alleged differences between the various exhibits, is not supported by substantial evidence. Rather, the Court finds that Plaintiff's written statements, as well as her hearing testimony, concerning her pain and her activities of daily living, are essentially consistent.[7] In that regard, the Court further notes that it is not overly helpful to compare Exhibit 4E with Exhibit 11E, since the two forms are very different. For example, Exhibit 11E contains eight pages of detailed questions for the claimant to answer, while Exhibit 4E contains only two and one-half pages of more-general questions. (Compare, 99-101, 144-151). Nor did the ALJ develop the record on this point, by questioning Plaintiff about any

---

[7]The statements are inconsistent in one respect, namely, with regard to Plaintiff's claimed need to recline or lie down. However, as to that, Plaintiff testified, at the hearing, held in 2006, that she needed to do so because one of her medications, that she had been taking for only about *two years*, caused her to feel sick. (382-83). Consequently, it appears that he need to lie down during the day may not pertain to her condition prior to her date last insured.

16

perceived inconsistencies in her statements. The Court also agrees with Plaintiff that the ALJ failed to consider Plaintiff's persistent attempts at treatment, in evaluating her credibility.

## CONCLUSION

For the reasons discussed above, defendant's application [#6] is denied, plaintiff's application [#4] is granted, and pursuant to 42 U.S.C. § 405(g), sentence four, this matter is remanded for further administrative proceedings consistent with this Decision and Order.

So Ordered.

Dated: Rochester, New York
April 22, 2008

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge